**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**VANESSA EMENO,**

                                        **Plaintiff,**

        **vs.**                                            **5:04-CV-1350**
                                                           **(NAM/GHL)**

**MICHAEL J. ASTRUE*,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

Office of Jonathan P. Foster               Jonathan P. Foster, Esq.
500 South Main Street
Athens, Pennsylvania 18810
Attorney for Plaintiff

Andrew T. Baxter                           William H. Pease, Esq.
United States Attorney for
the Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

        * On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social
        Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
        automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in
        this action.

**Norman A. Mordue, Chief U.S. District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Vanessa Emeno brings the above-captioned action pursuant to 42 U.S.C. § 405(g)

of the Social Security Act, seeking a review of defendant Commissioner of Social Security's

decision to deny her application for disability benefits.  Plaintiff alleges that she became disabled

on September 18, 2002 due to Crohn's disease, fibromyalgia, arthritis, renal failure, bone marrow suppression, thyroid condition, vitamin deficiency, blood condition, heart condition, vocal cord injury, depression and multiple attempted suicides.  Dkt. No. 21.  This matter was referred to United States Magistrate Judge George H. Lowe for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(d).   Magistrate Judge Lowe recommended that this Court enter judgment on the pleadings affirming the Commissioner's decision denying disability benefits and dismissing plaintiff's claims.  Presently before the Court are plaintiff's objections to the Report and Recommendation.[1]

## II.      FACTUAL BACKGROUND

Plaintiff was born on December 22, 1957.  T. at 107.  Plaintiff completed high school in 1975 and became a licensed practical nurse ("LPN") in 1986.  T. 136.  Plaintiff worked as an LPN from 1986 through 2002.  T. 131.  Although plaintiff returned to work in May 2003, she was suspended after approximately 80 hours for allegedly "throwing a glass of juice at a patient."  T. 144.

Plaintiff's primary care physician was Ahmad Mehdi, M.D.  According to the Administrative Transcript, plaintiff  first saw Dr. Mehdi on December 14, 1999.  T. 321.  Dr. Mehdi noted plaintiff's history of Crohn's disease and fibromyalgia.  T. 321.  On December 28, 1999 plaintiff saw Dr. Mehdi, and, according to his notes, had been working "extended hours lately" and was suffering edema.  T. 320.  Plaintiff saw Dr. Mehdi on February 22, 2000 for prescription refills and on June 20, 2000, regarding sores on her legs.  T. 319.

On January 15, 2001, plaintiff saw Dr. Mehdi for prescription refills and complained of a

---

[1]  Defendant has not submitted a response to plaintiff's objections.

sore throat.  T. 317.  Dr. Mehdi noted "migraine".  T. 317.  On January 27, 2001, plaintiff told Dr. Mehdi that she had headaches.  T. 318.  On February 2, 2001, Dr. Mehdi noted that plaintiff's headaches had resolved and that she "would like to return to work".  T. 318.  Dr. Mehdi wrote a "return to work" note for plaintiff.  T. 318.

On April 16, 2001, plaintiff was admitted to Cortland Memorial Hospital with chest pain.  T. 170.  Plaintiff was diagnosed with acute myocardial infarction.  T. 170.  Plaintiff was discharged on April 18, 2001.  T. 170.

A note from May 25, 2001, indicates that plaintiff suffered a migraine headache.  T. 315.  On June 1, 2001, plaintiff saw Dr. Mehdi to "go over labs".  T. 316.

On July 18, 2001, plaintiff saw Dr. Mehdi regarding "pain and swelling" over her left ankle" for which she "[h]as been self medicating" with an old prescription.  T. 316.  Dr. Mehdi prescribed antibiotics and questioned whether "anxieties/OCD" were part of the problem.  T. 314.  Dr. Mehdi considered a trial of Paxil instead of Elavil.  T. 314.  On July 24, 2001, plaintiff saw Dr. Mehdi regarding her ankle.  T. 314.

Plaintiff returned to Dr. Mehdi's office on August 17, 2001 concerning a flair up of Crohn's disease and complained of "chronic diarrhea".  T. 313.  Plaintiff saw Dr. Mehdi on September 14, 2001 regarding rectal pain.  T. 312.  Dr. Mehdi recommended that she have a CT scan of her pelvis to rule out an abscess, and prescribed an antibiotic.  T. 312.  When plaintiff returned to see Dr. Mehdi on September 18, 2001, she indicated that the rectal pain had diminished, but that she had stopped the antibiotics because she had an increase in diarrhea and abdominal pain.  T. 311.  Plaintiff complained that she felt tired and had body aches.  T. 311.  Dr. Mehdi noted that her rectal pain was "most likely infection abscess or fissure" and prescribed

3

antibiotics and Tylenol #3.  T. 311. Dr. Mehdi saw plaintiff again on September 21, 2001 and noted that her rectal pain continued to decline, recommended that she finish antibiotics, and prescribed prednisone.  T. 310.

On September 24, 2001, plaintiff was admitted to Cortland Memorial Hospital with exacerbation of Crohn's disease, fibromyalgia, intractable pain of lower extremities, diarrhea, and methicillin-resistant staphylococcus aureus in stool. T. 188.  Plaintiff was treated with steroids, pain medication, and antibiotics, and released on October 1, 2001.  T. 188.  Dr. Mehdi saw plaintiff on October 4, 2001, and noted that she was feeling better.  T. 309.

On November 1, 2001, plaintiff complained to Dr. Mehdi that her pain had increased.  T. 309.  Dr. Mehdi noted that plaintiff had spoken to Dr. Stuart Gillim and he had increased her prednisone dosage and was considering immunosuppression therapy.  T. 309.

Plaintiff saw Dr. Gillim regarding her Crohn's disease on November 15, 2001.  T. 343. Dr. Gillim noted that she was on prednisone, depressed, and gaining weight, but that her bowel was "under reasonably good control."  T. 343.

Dr. Mehdi's notes regarding plaintiff on December 7, 2001 indicate that plaintiff needed a doctor's note stating that she cannot work "4 days in a row" and "no more than 8 hours a day".  T. 308.

On January 11, 2002, Dr. Mehdi again noted plaintiff's Crohn's disease and fibromyalgia and prescribed Tylenol #3.  T.308.  On January 29, 2002, Dr. Mehdi noted that plaintiff was "doing well" and "starting back to work".  T. 307.  Dr. Mehdi noted Crohn's disease, gastroesophogeal reflux disease ("GERD"), edema, and prescribed Nexium, Lasix, Elavil, and gave her samples of Vioxx.  T. 307.

4

On April 25, 2002 plaintiff complained to Dr. Gillim of a flare up and diarrhea and was placed on prednisone.  T. 340.  On June 20, 2002 Dr. Gillim noted that plaintiff had "anthralgias, myalgias, intermittent diarrhea, fatigue[], depress[ion]", and was not sleeping well.  T. 341.

On June 28, 2002, Dr. Mehdi indicated that plaintiff was "doing well" and "responding to Rx well" but that she complained of "feeling sad" and "loss of appetite".  T. 307.  Dr. Mehdi recommended that plaintiff try Zoloft.  T. 307.

On July 15, 2002, plaintiff complained of a sore mouth, chest congestion, and swelling in hands and legs.  T. 306.  Dr. Mehdi discontinued plaintiff's Zoloft prescription because plaintiff reported that since taking it, her dyspepsia and GERD had increased.  T. 306.

On July 20, 2002, plaintiff received treatment at Cortland Memorial Hospital for chronic bronchitis.  T. 206.  Wendy Scinta, M.D., noted plaintiff's history of depression and indicated that she felt plaintiff had "a lot of underlying depression" that should be addressed with her primary doctor.  T. 206.

 On August 13, 2002, Dr. Gillim noted plaintiff was feeling "good".  T. 341.

On September 3, 2002, plaintiff complained of chronic aches and pains.  T. 305.  Dr. Mehdi recommended that she start Paxil, and gave plaintiff Vioxx and Nexium samples.  T. 305.  On September 16, 2002, Dr. Mehdi noted that plaintiff still suffered abdominal pain and diarrhea.  T. 304.  Dr. Mehdi prescribed oxycontin and Tylenol #4.  T. 304.

On September 19, 2002, plaintiff was admitted to Cortland Memorial Hospital with acute renal failure.  T. 219.  Salil Gupta, M.D., examined plaintiff on September 23, 2002, while she was still in Cortland Memorial Hospital. T. 222.  Dr. Gupta noted that plaintiff reported that she has not had a "flare-up of her Crohn's disease" and that she had "not had any diarrhea over the

5

past year." T. 222. Regarding plaintiff's acute renal failure, Dr. Gupta indicated that she "was probably volume depleted and dehydrated from diuretic use and inadequate p.o. intake and [unintelligible] use of Vioxx probably did not help either. The patient's renal function had improved." T. 223. Dr. Gupta therefore did not believe plaintiff needed "any further work up." T. 223. Dr. Gupta found plaintiff had "B12 deficiency and with Crohn's disease she should be on B12 shots." T. 223. According to Dr. Mehdi's notes, by the time she was discharged on September 25, 2002, plaintiff's acute renal failure "did resolve", her hypothyroidism was "being treated" and her "anemia ha[d] improved". T. 220.

On September 30, 2002, plaintiff complained to Dr. Mehdi of feeling low, sad, and unhappy, and stated that she "thought of hurting herself but she never did [and] has no clear plan". T. 303. Plaintiff also complained of abdominal pain. T. 303. Dr. Mehdi listed hypothyroidism, depression, and Crohn's disease in his notes and increased plaintiff's Paxil prescription. T. 303.

Plaintiff was admitted to Cortland Memorial Hospital from October 12, 2002 through October 18, 2002. T. 232. Plaintiff presented to the emergency room with complaints of "nausea and vomiting and possible hematemesis, dehydration, renal impairment, and hyponatremia." T. 232.

On October 15, 2002, plaintiff underwent a psychiatric examination by Susan Watrous, M.D. T. 237. Dr. Watrous's report indicates that plaintiff stated that, "many years ago", she was hospitalized for post partum depression after her daughter was born. T. 237. Dr. Watrus's report further indicates that plaintiff told her that "she has never been suicidal, but that there was one point in the past where she felt a strong desire to end her life" but did not act on that desire. T.

6

238.  According to Dr. Watrus's report, when she was 23, plaintiff:

> was hospitalized for almost three months after overdosing on Inderal.  She says that she had been started on this medication for migraine headaches.  She denies that this was an intentional overdose, and says that everything in her life was going well at the time.  She is not able to identify why she might have overdosed, except for a possible inadvertent accumulation of the medication in her system.  She says that she was intubated, and sustained a vocal cord injury at that time.  She denies any other actions that might be consistent with a suicide attempt.

T. 238.  Dr. Watrus found that plaintiff's "multiple medical conditions" were "exacerbated by depression that is related to multiple stressors in her life" and diagnosed plaintiff with "[m]ajor depressive disorder, recurrent, severe, without psychotic features."  T. 239-40.  Dr. Watrus recommended that plaintiff discontinue Paxil and start Celexa as well as counseling.  T. 239.

On October 11, 2002, plaintiff had a CT scan of her abdomen and pelvis which showed "no gastrointestinal obstruction or focal inflammation such as active Crohn's disease."  T. 248.

On December 3, 2002, Dr. Mehdi noted that plaintiff "need[ed] disability note to release for work" and listed fibromyalgia, bodyache, and Crohn's disease, followed by "stable".  T. 301.  Dr. Mehdi prescribed Tylenol #4 and oxycontin.  T. 301.  Dr. Mehdi also listed hypothyroidism, vitamin B12 deficiency, "Depression - on Celexa", and GERD.  T. 301.

In a note dated December 30, 2002, Dr. Gillim wrote:

> Patient is a 44-year-old woman with Crohn's disease involving predominantly the distal ilium and colon with symptoms of intermittent small bowel obstruction with abdominal cramping, nausea, and diarrhea.  She has recently been hospitalized under the auspices of Dr Mehdi with pancytopenia.  At that point her 6-Mercaptopurine therapy for her Crohn's disease was discontinued.  Clinical stigmata of her Crohn's disease have been episodes of pyoderma gangerenosum, increased abdominal borborygmi and right lower quadrant tenderness . . . .  Because of her recurrent symptoms of Crohn's disease I feel her to be totally and permanently disabled.

T. 339.

On January 3, 2003, plaintiff broke her left ankle when she slipped on ice.  T. 253.

7

Plaintiff was admitted to University Hospital from January 3, 2003 through January 8, 2003, where she received surgery on her ankle.  T. 263, 266.

Plaintiff had a follow-up appointment with Patrick Connolly, M.D. on January 24, 2003, at which time he noted that x-rays showed that her ankle was in "good position."  T. 276.  Dr. Connolly further noted that plaintiff was "temporarily, totally disabled."  T. 276.

On January 24, 2003, Dr. Mehdi indicated that plaintiff's fibromyalgia was being addressed with oxycontin, Tylenol #4, and Elavil, plaintiff's GERD was addressed with Nexium, and plaintiff's Crohn's disease was "stable".  T. 300.

Plaintiff saw Dr. Connolly again on February 27, 2003, regarding her ankle.  T. 275.  Dr. Connolly noted that plaintiff was able to tolerate weightbearing on her ankle, and stated that she could "return to work without restrictions at the end of 05/2003."  T. 275.

On February 19, 2003, plaintiff underwent a consultative psychiatric examination by Ruana Starer, Ph.D., upon referral by the Office of Disability Determinations following her claim for Social Security disability benefits..  T. 271.  Dr. Starer diagnosed plaintiff with dysthymic disorder and noted that her depression had improved since being treated with Celexa.  T. 273.  Dr. Starer indicated that plaintiff performed her own self care and concluded that "in terms of her mental status," plaintiff was "capable of working", which, Dr. Starer noted, plaintiff had been doing until she broke her ankle.  T. 274.

On February 28, 2003, plaintiff saw Dr. Mehdi and complained of heartburn.  T. 299.  Plaintiff's prescriptions for oxycontin and Tylenol #4 were continued.  T. 299.

On March 12, 2003, George Burnett, M.D., a state agency consultant, assessed the evidence regarding plaintiff's mental status and completed a residual functional capacity

8

assessment.  T. 279, 293.  Dr. Burnett found plaintiff suffered a depressive and dysthymic

affective disorder.  T. 282.  Dr. Burnett indicated that plaintiff's mental disorders mildly restricted

her "activities of daily living" and caused mild difficulties in "maintaining social functioning".  T.

289. Dr. Burnett stated that plaintiff's mental disorders caused moderate difficulties in

"maintaining concentration, persistence, or pace" and that plaintiff had "one or two" "episodes of

decompensation, each of extended duration".  T. 289.

According to Dr. Burnett, plaintiff's mental disorder did "not significantly limit[]" her

"understanding and memory".  T. 293.  Dr. Burnett found that plaintiff's ability to: " carry out

detailed instructions"; "maintain attention and concentration for extended periods"; "perform

activities within a schedule"; "complete a normal work-day and workweek without interruptions

and perform at a consistent pace"; "accept instructions and respond appropriately to criticism

from supervisors"; and "respond appropriately to changes in the work setting"  were "moderately

limited".  T. 293-94.

On April 7, 2003, plaintiff saw Dr. Mehdi regarding a chest cold.  T. 298-99.  On May 16,

2003, plaintiff saw Dr. Mehdi with complaints of fatigue, loss of energy, sleepiness, and

bodyache.  T. 335.  Dr. Mehdi prescribed, *inter alia*, oxycodone, and Tylenol #4.  T. 335.

On May 21, 2003, plaintiff saw Myra Shayevitz, M.D. for a consultative internal medicine

examination in connection with her claim for disability benefits.  T. 322.  Dr. Shayevitz noted that

plaintiff was diagnosed with Crohn's disease in 1998, but that she has not had any surgery and

has "been in remission for 1 year."  T. 322.  Dr. Shayevitz further noted that plaintiff was

diagnosed with fibromyalgia by rheumatologist Dr. Patrick Riccardi in 1996, T. 322, and that she

had a vocal cord injury after a suicide attempt during which she was intubated.  T. 323.   On

physical examination, Dr. Shayevitz found plaintiff appeared "in no acute distress" with a "a bobbling kind of gait", but that she could "walk on heels and toes without difficulty" and needed no assistive devices.  T. 324.  Dr. Shayevitz noted that plaintiff's voice was hoarse and her respirations were "noisy in the upper laryngeal area."  T. 324.  Dr. Shayevitz found plaintiff had full flexion in her spine, full range of motion of shoulders, elbows, forearms, wrists, hips, knees, and ankles.  T. 325.  Dr. Shayevitz noted that plaintiff had "tenderness" and "slight swelling of the left ankle".  T. 325.  Dr. Shayevitz found plaintiff had some positive fibromyalgia trigger points.  T. 325.  Dr. Shayevitz noted no motor or sensory deficit.  T. 325.  Dr. Shayevitz found plaintiff's prognosis "guarded" and stated: "The claimant is most comfortable sitting.  There certainly are limitations in any prolonged rapid standing, walking, stair climbing, and any heavy lifting on a repetitive basis.  The claimant's energy is limited.  Her hearing and speech are intact." T. 326.

In a physical residual functional capacity assessment completed on June 3, 2003, disability analyst Barbara J. Huber concluded that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, sit (with normal breaks) for a total of 6 hours in an 8 hour workday, and that plaintiff's ability to push and pull was unlimited.  T. 147.

On June 9, 2003, plaintiff was admitted to Cortland Memorial Hospital after attempting suicide by overdosing on oxycodone and Tylenol #3.  T. 450.  Plaintiff was released the following day.  T. 450.  According to the discharge summary completed by Dr. Mehdi, plaintiff stated that she had been fired from her job on June 6, 2003 "after she assaulted one of the residents and apparently was really afraid of her husband and this was a way maybe to run away from the problem."  T. 450.

10

Plaintiff was again admitted to the hospital on June 12, 2003 because she "was feeling weak, having abdominal pain, diarrhea and has not been eating for about two days, sad and crying." T. 464.

According to the discharge summary completed by Susan Watrous, M.D., plaintiff was admitted to the psychiatric unit of Cortland Memorial Hospital on June 13, 2003, and discharged on June 18, 2003, after her mood had improved, she felt able "to handle the stress of losing her job and possibly her nursing license", her diarrhea had resolved, and her pain "appeared to be well controlled with a Duragesic patch and Tylenol #4". T, 468-69. Dr. Watrous noted that plaintiff agreed to discontinue Celexa and try Lexapro, and was scheduled to follow up at Cayuga County Mental Health Center on June 26, 2003. T. 469.

On June 20, 2003, plaintiff again saw Dr. Mehdi regarding depression and fibromyalgia. T. 334. Dr. Mehdi prescribed Tylenol #4 and noted that "Husband will control release of Rx". T. 334. Dr. Mehdi saw plaintiff again on July 25, 2003 and noted her depression and GERD as "stable". T. 334. On September 5, 2003, plaintiff complained to Dr. Mehdi of dyspepsia. T. 323. Dr. Mehdi prescribed Aciphex for her GERD, and Tylenol #4 for her fibromyalgia. T. 323. Dr. Mehdi saw plaintiff on October 22, 2003, for chest cold and "stomach problem" and he refilled her prescriptions for Aciphex, Tylenol #4, and Elavil. T. 332.

On November 16, 2003, plaintiff went to the emergency room at Cortland Memorial Hospital following a motor vehicle collision. T. 499. Plaintiff was treated for pneumonia and contusions and discharged. T. 500.

Dr. Mehdi saw plaintiff on December 11, 2003, and plaintiff complained of feeling sad, tiredness, abdominal pain, and body ache. T. 505. Dr. Mehdi refilled her prescription for Tylenol

#4 and Aciphex. T. 505.

Dr. Mehdi saw plaintiff on January 19, 2004, and noted that her pain and GERD persisted, prescribed Tylenol #4, and gave her samples of Aciphex.  T. 504.

Plaintiff saw Dr. Mehdi again on February 6, 2004, and noted that she continued to complaint of body ache but her GERD was stable.  T. 502.  Dr. Mehdi gave plaintiff samples of Nexium and Aciphex.  T. 502.

On February, 27, 2004, plaintiff saw Dr. Mehdi with complaints of increased pain and weakness and Dr. Mehdi prescribed Tylenol #4 and noted that plaintiff was "permanently totally disabled".  T. 502.  Additionally, Dr. Mehdi noted plaintiff's GERD, and Crohn's disease, next to which, he wrote "stable".  T. 502.

In a letter dated April 12, 2004, Dr. Mehdi wrote "To whom it may concern:"

I am writing this letter on behalf of Ms. Vanessa Emeno a patient of mine since 12/07/01. Ms Emeno has the following medical diagnosis:

1.  Fibromyalgia with associated chronic fatigue, malaise, pain and neuropathy to different parts of the body.
2.  Crohn's disease - also with frequent flare ups
3.  Hypothyroidism
4.  Depression with H/O multiple suicide attempts with one leading to intubation and damage to vocal cords
5.  S/P MI
6.  VB12 defeciency [sic]
7.  S/P ARF
8.  S/P left ankle fracture with persistant [sic] pain
9.  lower extremities edema
10. GERD
11. Insomnia
12. Chronic diarrhea 2nd to Crohn's

All the above diagnosis are well documented, recurrent and chronic in nature and I strongly believe that the main cause for all above is Crohn's disease and it's [sic] manifestations that is potentially is [sic] expected to cause more complications and further increase her suffering and disability.

Ms. Emeno is totally and permanently disabled with rest and reduction in physical activity playing a major role in providing some improvement in her quality of life, but even though she will still be suffering.

T. 501.

In a letter dated April 22, 2004, "To Whom it May Concern", Dr. Gillim wrote that although the symptoms from her inflammatory bowel disease have been "extremely disabling", at "the current time, however, all my studies would suggest that her inflammatory bowel disease is quiescent.  Most recent colonoscopy and upper GI series with small bowel follow-through have been within normal limits.  She certainly still has bowel symptoms which more probably relate to irritable bowel syndrome than inflammatory bowel disease." T. 510.  Dr. Gillim indicated that there is a strong correlation between fibromyalgia and irritable bowel syndrome and that they "produce[] rather significant discomfort." T. 510.  Finally, Dr. Gillim stated that plaintiff "certainly continues to be disabled by her bowel symptoms which, as I mentioned, most likely result from irritable bowel syndrome at this time rather than active inflammatory bowel disease." T. 510.

### III.    PROCEDURAL HISTORY

On November 13, 2002, plaintiff filed an application for disability insurance benefits alleging that she became unable to work on September 18, 2002.  T. 106-09.  In a notice dated June 4, 2003, the Commissioner disapproved plaintiff's claim for disability benefits.  T. 97-100. On August 1, 2003, plaintiff filed a request for a hearing by an administrative law judge ("ALJ") alleging disability "due to Crohn's Disease, Fibromyalgia, depression with fatigue, chronic diarrhea, dehydration, insomnia, a heart condition, hypothyroidism, arthritis, pernicious anemia, anemia, a chronic left ankle post-surgery problem, an injury to my vocal chords which makes it

13

difficult to breathe, and an attempted suicide on June 9, 2003."  T. 101.  On March 25, 2004, a

hearing was held before ALJ at which plaintiff was represented by counsel.  T. 39.  Plaintiff and a

vocational expert testified at the hearing.  T. 39-95.

        In a decision dated June 15, 2004, the ALJ found that plaintiff was not disabled and

therefore concluded she was not entitled to disability insurance benefits.  T. 29.  In a letter dated

July 8, 2004, plaintiff, through her attorney, requested a review of the ALJ's decision, T. 10.  In a

notice dated September 24, 2004, the Appeals Council denied plaintiff's request to review the

ALJ's decision.  T. 5.  This action followed.

## IV.  ADMINISTRATIVE LAW JUDGE'S DECISION

        To be eligible for Social Security disability benefits, a claimant must establish  "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating

disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2)
> that he has a 'severe impairment,' (3) that the impairment is not one [listed in
> Appendix 1 of the regulations] that conclusively requires a determination of disability,
> and (4) that the claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type of work the
> claimant can do." The claimant bears the burden of proof on the first four steps, while
> the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

        In this case, the ALJ found at step one that plaintiff did not engage in substantial gainful

activity since her alleged disability onset date: September 18, 2002.  AT. 17.  At step two, the

ALJ determined that plaintiff's "Crohn's disease; reported history of fibromyalgia; obesity,

reported history of myocardial infarction; history of hypothyroidism; history of anemia; history of

acute renal failure; history of vocal chord damage; and mild depression" were "severe and have

significantly limited her physical and mental ability to perform basic work activities for at lease

12 consecutive months."  T. 17.  The ALJ noted that plaintiff took medication for GERD, had

alleged breathing problems, a history of migraine headaches, and a chronic left ankle problem

following her injury in January 2003, but that these conditions "have not consistently imposed

any significant limitations upon the claimant's work-related abilities that have persisted for 12

consecutive months."  T. 17.  At step three, the ALJ concluded that plaintiff's impairments

neither met nor equaled any impairment listed in Appendix 1 of the Regulations.  AT. 17.  In

reaching this conclusion, the ALJ specifically considered evidence relating to speech,

cardiovascular system, digestive system, neurological, mental disorders, and immune system.  T.

17.  The ALJ next found that plaintiff retained the residual functional capacity ("RFC") to:

> perform unskilled, routine and repetitive work at a sedentary level of physical
> exertion that affords the option to either sit or stand; that allows, in addition to
> regularly scheduled breaks, restroom breaks of up to 10 minutes at least every 90
> minutes; that does not entail significant background noise if ongoing vocal
> communication is required; and that primarily involves things rather than people.

T. 26.  Therefore, at step four, the ALJ concluded that plaintiff was not capable of meeting the

exertional demands of her past relevant work as an LPN.  T. 26.  Since plaintiff's ability to

perform all or substantially all of the requirements of sedentary work was impeded by additional

impairment-related limitations, the ALJ obtained the testimony of a vocational expert to

determine whether there were jobs plaintiff could perform.  Based upon the vocational expert's

15

testimony, the ALJ concluded, at step five, that there were a significant number of jobs in the regional and national economy that plaintiff could perform, such as work as a surveillance system monitor or a "preparer".  T. 27.  The ALJ concluded that plaintiff was not disabled and denied her application for SSI benefits.  The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  This action followed.

## V.   REPORT AND RECOMMENDATION

In the Report and Recommendation, Magistrate Judge Lowe found that: (1) the ALJ did not err in declining to accord "special significance" to the opinions of Drs. Mehdi and Gillim, plaintiff's treating physicians; (2) the ALJ's finding that plaintiff's subjective allegations were not totally credible was supported by substantial evidence; and (3) the ALJ properly addressed plaintiff's work history.

Presently before the Court are plaintiff's objections to Magistrate Judge Lowe's first and third findings, specifically:  (1) that the magistrate judge erred in concluding that the ALJ properly declined to accord "special significance" to the opinions of plaintiff's treating physicians; and (2) that the magistrate judge erred in concluding that the ALJ appropriately considered plaintiff's work history.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court engages in a *de novo* review of any part of a magistrate judge's report and recommendation to which a party specifically objects.  Failure to object timely to any portion of a magistrate's report and recommendation operates as a waiver of further judicial review of those matters.  *See Roland v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).  The Court will address plaintiff's objections accordingly.

16

**VI.    DISCUSSION**

    **A.    Standard of Review**

        In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether plaintiff is disabled.  Rather, the Court must examine the administrative transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and citation omitted).  An ALJ is obligated to develop the record regardless of whether claimant is represented by counsel.  *See Shaw*, 221 F.3d at 131 (citations omitted).

    **B.    Treating Physicians**

        Plaintiff contends that the ALJ failed to give appropriate weight to the opinions of her treating physicians, Drs. Gillim and Mehdi, both of whom stated that she is totally disabled.

        **1.    Dr. Gillim**

        The ALJ accorded "no significant weight" to Dr. Gillim's opinion that plaintiff was "totally and permanently disabled" due to "recurrent symptoms of Crohn's disease".  T. 20. Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d

Cir. 1993); *see also Filoramo v. Apfel*, 1999 WL 1011942, at *7 (E.D.N.Y. 1999) (holding that the ALJ properly discounted the assessment of a treating physician as it was inconsistent with opinions of other treating and consulting physicians).  However, the ultimate issue of disability is reserved for the Commissioner.  *See* 20 C.F.R. § 404.1527 (e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

In this case, the ALJ explained that she decided not to accord significant weight to Dr. Gillim's opinion because opinions on the issue of disability are "expressly reserved" to the Commissioner.  Thus, the ALJ properly found that Dr. Gillim's opinion that plaintiff was "totally and permanently disabled" was not entitled to significant weight.  Moreover, as the ALJ pointed out, Dr. Gillim's December 30, 2002 opinion, T. 339, was not supported by the record.  On October 11, 2002, plaintiff had a CT scan of her abdomen and pelvis, which showed "no gastrointestinal obstruction or focal inflammation such as active Crohn's disease."  T. 248. Additionally, Dr. Mehdi characterized plaintiff's Crohn's disease as "stable" on December 3, 2002, and February 27, 2004, T. 301, 502, and Dr. Gillim described plaintiff's Crohn's disease as "quiescent" as of April 22, 2004, T. 510.  Although Dr. Gillim also stated that plaintiff "continue[d] to be disabled by her bowel symptoms, which . . . most likely result from irritable bowel syndrome rather than active [Crohn's] disease", T. 510, he offered no explanation how plaintiff's bowel symptoms impacted her residual functional capacity.  Thus, the ALJ properly assigned no weight to Dr. Gillim's opinion on the ultimate issue of whether plaintiff was disabled.

### 2.    Dr. Mehdi

In a letter dated April 12, 2004, Dr. Mehdi, who had been treating plaintiff since 1999,

18

listed twelve of plaintiff's diagnoses and stated that plaintiff was totally and permanently physically disabled due to her multiple conditions.  *See* T. 501, *infra*.  Again, the issue of disability is reserved for the Commissioner.  *See* 20 C.F.R. § 416.927(e)(1).  The ALJ therefore properly disregarded Dr. Mehdi's opinion on this issue.  Additionally, the ALJ copiously reviewed Dr. Mehdi's records and explained why she found Dr. Mehdi's opinion was not supported by substantial evidence.

The ALJ is required to accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques, results from frequent examinations, and is supported by the administrative record. *Schnetzler v. Astrue*, 533 F.Supp.2d 272, 285 (E.D.N.Y. 2008).   An ALJ may refuse to consider the treating physician's opinion controlling if he is able to set forth good reason for doing so. *Barnett v. Apfel*, 13 F.Supp.2d 312, 316 (N.D.N.Y. 1998).   When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. 404.1527(d)(2).  The opinion of the treating physician is not afforded controlling weight where the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion is not controlling when contradicted "by other substantial evidence in the

record"); 20 C.F.R. § 404.1527(d)(2).  Further, an opinion that is not based on clinical findings

will not be accorded as much weight as an opinion that is well-supported.  20 C.F.R. §

404.1527(d)(3), 416.927(d)(3); *see also Stevens v. Barnhart*, 473 F.Supp.2d 357, 362 (N.D.N.Y.

2007).  Similarly, the less consistent an opinion is with the record as a whole, the less weight it is

to be given.  *Stevens*, 473 F.Supp.2d at 362; *see also Otts v. Commissioner of Social Sec.*, 249

Fed.Appx. 887, 889 (2d Cir. 2007) (an ALJ may reject such an opinion of a treating physician

"upon the identification of good reasons, such as substantial contradictory evidence in the

record").

    In this case, Dr. Mehdi identified the conditions listed in his April 12, 2004 letter as

"recurrent and chronic in nature", T. 501, and stated that plaintiff had "frequent flare-ups" of

Crohn's disease.  However, in his notes Dr. Mehdi characterized plaintiff's Crohn's disease as

"stable" in December 2002, and her depression as "stable" in July and September 2003.

Additionally, on April 22, 2004, Dr. Gillim stated that his studies suggested plaintiff's Crohn's

disease was, at that time, "quiescent".

    The ALJ also had an evidentiary basis for questioning Dr. Mehdi's statement that plaintiff

had made "multiple suicide attempts".  Although the record indicates plaintiff attempted suicide

in June 2003, plaintiff specifically denied any prior suicide attempts and stated that her overdose

on Inderal at age 23 was unintentional.  Thus, the ALJ had a substantial factual and legal basis for

declining to accord Dr. Mehdi's opinion that plaintiff was "totally and permanently disabled",

controlling weight.

**C.    Work History - Credibility**

    Plaintiff contends that the ALJ erred "by failing to give the Plaintiff's testimony

concerning her work abilities 'substantial credibility'" and did not "properly address" her work history.  Dkt. No. 21, p. 17.  Social Security regulations specify that the ALJ is to consider "all of the evidence presented, including information about your prior work record," 20 C.F.R. § 416.929(c)(3).  "[A] good work history may be deemed probative of credibility".  *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).

In this case, the ALJ found plaintiff's allegations as to her impairment-related limitations "partially credible".  T. 18.  In reaching this conclusion, the ALJ specifically considered plaintiff's work record and found that it demonstrated an "ongoing ability to work despite evidence of many of the allegedly disabling conditions as to which she presently complains."  T. 18.  Additionally, as the ALJ noted, when plaintiff permanently stop working in May 2003, it was not due to her alleged impairment-related limitations, but because she was suspended from her job after being accused of throwing juice at a patient.  Thus, plaintiff's argument that the ALJ failed to consider her work history is without merit and there is substantial evidence to support the ALJ's decision that plaintiff's absence from the workplace after May 2003, was not due to her alleged impairments but to other factors.

Moreover, the Second Circuit has emphasized that "work history is just one of many factors that the ALJ is instructed to consider in weighing credibility of claimant testimony", *Schaal*, 134 F.3d at 503.  In this case, plaintiff has not otherwise challenged Magistrate Judge Lowe's conclusion that the ALJ's finding that plaintiff's allegations regarding her impairment - related limitations "are not fully credible",  T. 28, is supported by substantial evidence.  Accordingly, plaintiff's objection to Magistrate Judge Lowe's conclusion regarding credibility is without merit.

**VII.   CONCLUSION**

For the foregoing reasons, and having reviewed *de novo* those portions of the Report and Recommendation to which plaintiff objected, it is hereby

**ORDERED** that the **Report and Recommendation is accepted in its entirety**; and it is further

**ORDERED** that **judgment be entered for defendant**.

**IT IS SO ORDERED.**

Date:   September 30, 2009

Norman A. Mordue
Chief United States District Court Judge